# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN RELVAS, et al.,

    Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN, et al.,

    Defendants.

Case No.: 1:14-cv-01752-RCL

## MEMORANDUM OPINION

### I. LIABILITY

This civil action was filed under 28 U.S.C. § 1605A and arises out of the bombing of the United States Marine barracks in Beirut, Lebanon on October 23, 1983. *Foley v. Islamic Republic of Iran*, No. 14-CV-01752-RCL (D.D.C. 2014). ECF No. 1 (Complaint). The nearly 80 plaintiffs in this action include servicemen killed or injured in the terrorist attack, their estates, and family members. Defendants were served through diplomatic channels on May 17, 2016. ECF No. 38. Prompted by defendants' failure to answer, and upon affidavit by plaintiffs' counsel, the clerk of court entered a default against defendants on July 21, 2016. ECF Nos. 39 and 40. On July 27, 2016, plaintiffs' counsel filed a motion for default judgment, asking this Court "to take notice of the liability decisions entered in the related cases of *Peterson v. Islamic Republic of Iran* (*Peterson I*), 264 F.Supp.2d. 46 (D.D.C. 2003) and *Fain v. Islamic Republic of Iran*, 856 F.Supp.2d 109 (D.D.C. 2012)." ECF No. 41. That same day, plaintiffs' counsel moved for the appointment of a special master. ECF No. 42. This Court granted both motions on October 25, 2016. ECF No. 45.

## II. DAMAGES

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Survivors may recover damages for their pain and suffering; estates of the deceased may recover economic losses stemming from wrongful death to the victims of terrorism; family members may recover solatium for their emotional injury; and all plaintiffs may recover punitive damages. *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 82–83 (D.D.C. 2010).

Under the FSIA, a "default winner must prove damages in the same manner and to the same extent as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003). A plaintiff "must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105, 115–16 (D.D.C. 2005) (quoting *Hill*, 328 F.3d at 681 (internal quotations omitted)). Plaintiffs in this action have amply demonstrated that defendants' commission of acts of extrajudicial killing and provision of material support and resources for such killing were reasonably certain to – and indeed intended to – cause injury to plaintiffs. *Peterson v. Islamic Republic of Iran (Peterson II)*, 515 F.Supp.2d 25, 37 (D.D.C. 2007).

Apropos of damage awards, the Court has received and reviewed the recommendations of the special master and hereby ADOPTS, without discussion, all facts found by and recommendations made by the special master which conform to the well-established damages frameworks articulated below. *See Peterson II*, at 52–53; *Valore*, 700 F.Supp.2d at 84–87. The

Court will, however, discuss those instances where the special master has recommended awards that deviate from these frameworks.

   A.   Pain and Suffering

Assessing appropriate damages for physical injury or mental disability depends upon a myriad of factors. Where "death was instantaneous there can be no recovery. . . ." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 112 (D.D.C. 2000) (citation omitted). *See also Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22, 39 n.4 (D.D.C. 2016) (where plaintiffs "submit[] no evidence . . . showing that either of the [v]ictims suffered any pain and suffering prior to their deaths in the suicide bombings," damages must be denied). Victims who survived a few minutes to a few hours after the bombing typically receive an award of $1 million. *Elahi*, 124 F.Supp.2d at 113.

For victims surviving for a longer period of time, this Court considers "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson II*, 515 F.Supp.2d at 52 n. 26 (citing *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)). In *Peterson II*, this Court adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages. *Id.* at 54. This approach is not rigidly applied, however, and this Court has indicated it will "depart upward from this baseline to $7–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore*, 700 F.Supp.2d at 84, and

will "depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012) (citation and internal quotation marks omitted).

For servicemen suffering emotional, but no physical injury, this Court has adopted a general framework for the calculation of pain and suffering damages whereby they are "typically awarded $1.5 million." *Worley v. Islamic Republic of Iran*, 177 F.3d 283, 286 (D.D.C. 2016). *See also Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (awarding $1.5 million in damages to Marine stationed aboard USS Iwo Jima at time of attack but participated in recovery efforts and suffered from PTSD). *See also Peterson*, 515 F.Supp.2d at 56; *Valore*, 700 F.Supp.2d at 84.

The following represent instances where the special master's recommended awards for pain and suffering damages do not comport with the frameworks articulated above.

1. Upward Departures

    a) *Mark Boyd*

The special master recommended that Mark Boyd receive an enhancement of $500,000 to the $1.5 million typically awarded to victims who "suffer[ed] severe emotional injury without physical injury." *Kaplan v. Hezbollah*, 213 F.Supp.3d 27, 36 (D.D.C. 2016) (citing *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012)). Mr. Boyd's testimony revealed he was assigned the particularly gruesome task of locating the body parts of those killed by the blast and placing severed heads, arms, legs, and torsos of his fellow servicemen into body bags.

In recommending an enhancement, the special master reasoned that, unlike many servicemen whose claims of PTSD are either self-diagnosed or evaluated only after the initiation

of a lawsuit, Mr. Boyd's records reflect no fewer than 33 attempts on his part to seek psychiatric intervention. Further, medical records corroborate Mr. Boyd suffering from a galaxy of ailments in addition to PTSD, including debilitating "mood disturbances such as depression, anxiety, feelings of anger; chronic sleep disturbances; difficulty with social interaction; lack of concentration; and increasing social isolation resulting in severe, but less than total, social and occupational impairment." The $1.5 million baseline established by this Court recognizes that all survivors of the Beirut massacre are presumed to suffer "lasting and severe psychological problems from the attack." *Estate of Doe v. Islamic Republic of Iran*, 943 F.Supp.2d 180, 188 (D.D.C. 2013). An enhancement is warranted where a survivor presents with a profound set of documented ailments resulting from their experience. The Court agrees that such an enhancement is appropriate in this instance and ADOPTS the special master's recommendation that Mark Boyd be awarded $2 million for pain and suffering.

    (b)    *John Ijames*

The special master recommended that John Ijames be awarded $2 million for pain and suffering – reflecting an enhancement of $500,000 from the baseline award established by this Court. Mr. Ijames was involved in the transport of dead servicemen from land to the USS Iwo Jima and was assigned the horrific task of handling the bodies of servicemen who were burned and disfigured beyond recognition.

The special master based his recommendation not only on Mr. Ijames' detailed description of his service-related traumas but on medical records indicating Mr. Ijames suffers from service-related "PTSD, bipolar, depression severe without psychosis, insomnia related to mental, alcohol dependence," "borderline schizophrenia," and "intense and intrusive memories

of his time in the service, frequent panic attacks (with tachycardia, profound anxiety and sweats), nightmares, insomnia, uncontrollable tears, over-reactive startle, and episodes of extreme anger with violent outbursts." On this record, the Court agrees that Mr. Ijames' ailments go well beyond the normal range of post-traumatic stress disorders which generally inform the baseline award set out in *Worley* and ADOPTS the special master's recommendation that Mr. Ijames be awarded $2 million in damages for pain and suffering.

(c) *Gregory Simmons*

The special master recommended that Gregory Simmons receive an enhancement of $500,000 in compensation for his service-related pain and suffering. Gregory Simmons was among those involved in the recovery effort immediately following the October 23 bombing. His testimony recounts the week he spent uncovering bodies with "missing limbs, chunks of flesh, decapitated, just dead." He recalls working in one area which "smelled of blood, a lot of blood mixed with explosives that you just can't describe it, but you won't forget it." His contemporaneous letters to his family recount finding fellow servicemen "decapitated . . . . [n]o arms, no legs, no faces," and describe one incident when he "picked up a body and the skin peeled off in [his] hands."

Mr. Simmons' medical records are equally detailed in their description of the constellation of maladies Mr. Simmons suffered, and continues to suffer, as a direct result of his experiences in Beirut. Records supplied from the VA indicate he is afflicted with "bipolar II disorder and PTSD, chronic," for which he has been prescribed several psychotropic medications, and as being "hypervigilant, quick to anger, isolates himself for days at a time, has nightmares, difficulty sleeping and has difficulty in crowds." On this record, the Court ADOPTS

the special master's recommendation that Mr. Simmons be awarded $2 million in damages for pain and suffering.

   2.   Downward Departures

       a)   *Al Duncan*

The special master recommended that Al Duncan receive $750,000 – an award representing half of the $1.5 million baseline established in *Worley*. Mr. Duncan, although present at Beirut at the time of the bombing, was a member of an amphibious unit stationed at an "impact zone," – an "area where we witnessed the actual rubble of the barracks and the first responders that were working there, the overturned vehicles, just the levels of the barracks that collapsed." And although forced to view the "vehicles, trucks still overturned, not cleaned up as of yet," as well as "remnants of United States flags and furniture, personal effects," Mr. Duncan neither engaged in the rescue operation nor endured the trauma of searching for survivors or collecting the remains of the blast's victims. He attributes his alleged trauma, instead, to the overall "destruction"; to having been on "high alert"; to being exposed to the "smell of a strong odor of explosives"; and to being under sniper fire for seven days in a skirmish unrelated to the terrorist attack. And although Mr. Duncan was diagnosed with PTSD, his diagnosis was made in 2013 – after he had been employed for years as an employee of the New York City Department of Corrections; after serving as a member of the Emergency Services Unit which responded to Ground Zero in Manhattan on 9/11; and after spending "the next approximately four and a half to five months rotating from Ground Zero to Fresh Kills Landfill." The presumption articulated in *Doe* – that survivors of the Beirut bombing suffer emotional trauma – does not relieve claimants from demonstrating a nexus between the terror attack and their claimed damages. This Court

agrees with the special master that Mr. Duncan has not demonstrated such a nexus and ADOPTS the recommendation that Mr. Duncan be awarded $750,000 in damages for pain and suffering.

b) *Ross Morrison*

The special master recommended that Ross Morrison receive a reduced award of $750,000. The special master's recommendation was based on testimony that Mr. Morrison was not part of the search and rescue effort; that he only viewed the aftermath of the bombing from a distance; and that the wound he received was the result of a "secondary attack" unrelated to the bombing. Mr. Morrison does not describe suffering from any of the array of symptoms or traumas which have plagued similarly-situated servicemen nor did he, at any time, seek medical assistance. The Court agrees with the special master's findings and ADOPTS the special master's recommendation that Ross Morrison be awarded $750,000 in compensatory damages for pain and suffering.

B. Economic Loss

The estates of those servicemen killed in the terrorist attack have proven to the satisfaction of the special master, and thus to the satisfaction of this Court, the loss of accretions resulting from these wrongful deaths. *Valore*, 700 F.Supp.2d at 85. The Court therefore ADOPTS, without modification, the special master's recommended damage awards for economic loss.

C. Solatium

This Court developed a standardized approach for FSIA intentional infliction of emotional distress, or solatium, claims in *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006). In *Heiser*, this Court surveyed damages awarded to the family members of the

deceased victims of terrorism and determined, based on averages, that "[s]pouses typically receive greater damage awards than parents [or children], who, in turn, typically receive greater awards than siblings." *Id.* at 269. Specifically, this Court established a framework whereby spouses of deceased victims receive approximately $8 million, while parents receive $5 million and siblings receive $2.5 million. *Id. See also Valore*, 700 F.Supp.2d at 85 (observing that courts have "adopted the framework set forth in *Heiser* as 'an appropriate measure of damages for the family members of victims'") (quoting *Peterson II*, 515 F.Supp.2d at 51).

When applying this framework, this Court is mindful that "[t]hese numbers ... are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 79 (D.D.C. 2010), and that deviations may be warranted when confronted with "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship" or with "medical proof of severe pain, grief or suffering on behalf of the claimant and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi v Islamic Republic of Iran*, 768 F.Supp.2d 16, 26-27 (D.D.C. 2011). Conversely, downward departures may be appropriate where the evidence suggests that the relationship between the victim and his family members is attenuated, *Valore*, 700 F.Supp.2d at 86, or where a claimant fails to "prove damages in the same manner and to the same extent as any other default winner." *Hill*, 328 F.3d at 683.

The following represents instances where the special master's recommended awards for loss of solatium deviate from the *Heiser* framework.

1. <u>Upward Departures</u>
   a) *William Faulk*

The special master recommended that William Faulk, whose brother James Faulk was killed on October 23, 1983, receive a solatium award in the amount of $3 million – reflecting a $500,000 enhancement from the baseline established in *Heiser*. The special master found evidence of an "especially close relationship, particularly in comparison to the normal interactions to be expected given the familial relationship," *Oveissi*, 768 F.Supp.2d at 27, compelling such an enhancement. Aside from being close in age, the testimony revealed that William was a surrogate father for James during their parents' prolonged absences, that the brothers were placed in the foster system together, worked for the same employer, engaged in activities together, did homework together and generally enjoyed a relationship more intimate than that shared by most siblings. The Court agrees with the special master's recommendation that William Faulk be awarded $3 million in compensatory damages for loss of solatium.

2.  Downward Departures

    a)  *Estate of Kenneth Coleman*

The special master recommended that Kenneth Coleman, whose brother Marcus Coleman was killed in Beirut, receive $500,000 less than the presumptive $2.5 million baseline award established in *Heiser*. Kenneth died prior to the filing of this action. The special master based his recommendation on the paucity of evidence describing the relationship between the brothers. Kenneth's sister, Marsha, testified only that Kenneth may have hosted Marcus' high school graduation party. His brother, Michael, assumed, for reasons not stated in the record, that Kenneth's alcohol abuse and inability to maintain steady employment was the result of Marcus' death. No other family member offered any glimpse into the relationship between the two brothers. The Court agrees that Kenneth failed to "prove damages in the same manner and to

the same extent as any other default winner," *Hill*, 328 F.3d at 683, and therefore ADOPTS the special master's recommendation that the Estate of Kenneth Coleman be awarded $2 million in compensatory damages for loss of solatium.

D. Punitive Damages

In assessing punitive damages, this Court has observed that any award must balance the concern that "[r]ecurrent awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little deterrent effect...," *Murphy*, 740 F.Supp.2d at 75, against the need to continue to deter "the brutal actions of defendants in planning, supporting and aiding the execution of [terrorist attacks]." *Rimkus v. Islamic Republic of Iran*, 750 F.Supp.2d 163, 184 (D.D.C. 2010). In furtherance of this goal, this Court held that the calculation of punitive damages in subsequent related actions should be tied directly to the ratio of punitive to compensatory damages set forth in earlier cases. *Murphy*, 740 F.Supp.2d at 76. The ratio of $3.44 was established in *Valore* – an earlier FSIA case arising out of the Beirut bombing. *Id.* at 82–83 (citing *Valore*, 700 F.Supp.2d at 52). The Court will again apply this same $3.44 ratio, resulting in a total punitive damages award of $955,652,324.

**CONCLUSION**

This Court appreciates the efforts by plaintiffs to hold Iran and its Ministry of Intelligence accountable for their support of terrorism. The Court concludes that defendants must be punished to the fullest extent legally possible for the bombing in Beirut on October 23, 1983 – a depraved act that devastated the lives of countless individuals and their families, including the nearly 80 plaintiffs who are parties to this lawsuit. This Court hopes that the victims and their

families may find some measure of solace from this Court's final judgment. As stated, the Court finds defendants responsible for the injuries sustained by the plaintiffs and thus liable under the FSIA's state-sponsored terrorism exception for $207,222,647.03 in compensatory damages and $712,845,905.78 in punitive damages, for a total award of $920,068,552.81

A separate Order and Judgment consistent with these findings shall be entered this date. SO ORDERED.

DATE: 2/27/18

Royce C. Lamberth
United States District Court for the
District of Columbia